UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PENNY DAVENPORT, et al., individually and on behalf of others similarly situated, ) ) ) | |
| Plaintiffs, ) | |
| vs. ) | Case No. 4:12CV00007 AGF |
| ) | |
| CHARTER COMMUNICATIONS, LLC, ) ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Penny Davenport and three other named Plaintiffs brought this action on their own

behalf and on behalf of similarly situated call center employees who worked on an hourly

basis at Defendant Charter Communications, LLC ("Charter").   Plaintiffs claim that

Charter violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; the state wages

and hours laws of Missouri, Kentucky, and Michigan; and Missouri common law, by

failing to pay them for the time it took them to access computer applications when

beginning to work and to close down computer applications at the end of work.[1]

Plaintiffs moved for conditional collective action certification under the FLSA, and

the Court granted Plaintiffs' motion, requiring that notice be disseminated to putative

plaintiffs consisting of:

---

[1]     Following the Court's ruling on Defendant's Motion for Judgment on the Pleadings (Doc. No. 218), the only claims remaining are Plaintiffs' individual and class claims under the FLSA (Count I), the Missouri Minimum Wage Law, Mo. Rev. Stat. ' 290.500, et seq. (Count II), and Missouri common law (Counts II-V); and Plaintiff Rita Gentry's individual claim under the Kentucky Wages and Hours Act, Ky. Rev. Stat. § 337.010 et seq. (Count VI).

> All persons who, between September 25, 2009 and August 31, 2011 worked as a nonsupervisory hourly employee whose primary duty was to respond to incoming calls from a queue on Charter's toll-free lines, commonly referred to as "advisors," "representatives," or "agents," who were hired and had completed training before September 1, 2011, and who worked at Defendant Charter Communications, LLC's call centers located in Town and Country, Missouri; Walker, Michigan; Louisville, Kentucky; Greenville, South Carolina; Vancouver, Washington; Rochester, Minnesota; Fond du Lac, Wisconsin; and Worcester, Massachusetts, but excluding persons who were hired by Defendant but worked only as trainees.

(Docs. No. 203-1 & 204.)   To date, several hundred putative plaintiffs have filed consents to join the FLSA collective action.

Plaintiff Davenport now moves (Doc. No. 140) to certify as class actions under Rule 23(b)(3) her claim for violation of the Missouri Minimum Wage Law, Mo. Rev. Stat. ' 290.500, et seq., and her claims for breach of contract, quantum meruit, and unjust enrichment under Missouri common law (collectively, the "Missouri Claims").   Unlike the FLSA collective action, these Rule 23 class actions, if certified, will require individuals to opt out of the suit or be bound by the judgment in the case.   *See* Fed. R. Civ. P. 23(c)(3); *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 177 (1989) (Scalia, J., dissenting).

Charter opposes the motion for class certification and, in support of its opposition, submits several declarations of putative class members.   Plaintiffs move to strike these declarations.[2]   Oral arguments were heard on the motion for class certification and the

---

[2]     Plaintiffs originally filed three motions for class certification relating to their claims under Missouri, Kentucky, and Michigan law.   (Docs. No. 140, 143 & 145.)   Charter filed a consolidated opposition to Plaintiffs' three class certification motions and submitted several declarations in support thereof.   (Doc. No. 156-1.)   On August 4, 2014, the Court denied two of Plaintiffs' motions for class certification, relating to Plaintiffs' claims under Kentucky and Michigan law.   (Doc. No. 218.)   Therefore, only Plaintiffs' motion to

motion to strike on August 20, 2014, and the parties thereafter submitted supplemental filings.   For the reasons set forth below, the Court shall **DENY** both motions.

## BACKGROUND

Davenport and the putative class members were call center agents, alternatively known as "advisors," "representatives," or "agents," employed at Charter's call center in Town & Country, Missouri during the relevant time period, whose primary duty was to receive calls from Charter's customers, not other Charter employees.   The agents were scheduled to work 40 hours per week.

Davenport alleges that Charter employed uniform policies and practices that resulted in agents at its Town & Country call center working off the clock by performing activities such as logging on and off computers, opening and closing applications, and reading instructions before and after their paid shifts.   Davenport alleges that these logon and logoff activities were integral and indispensable to performance of the agents' primary work duties, and agents were not properly compensated for these activities by Charter.   In support of her allegations, Davenport offers her own declarations and the declaration of another employee at the Town & Country call center, James Rachal, as well as Charter's corporate documents and deposition testimony by Charter's corporate representative.   On August 31, 2014, Plaintiffs filed a notice of newly-discovered evidence in support of Davenport's class certification motion, and attached declarations of two other agents

---

certify the Missouri Claims remains in this case, and Plaintiffs' counsel confirmed at oral argument that Plaintiffs' motion to strike now relates solely to the declarations submitted in support of Charter's opposition to certification of the Missouri Claims.

employed at Charter's Town & Country call center, Katherine Fenerson and Valerie Mason, who previously provided declarations in support of Charter.   (Doc. No. 250-1.)

The specific policies and practices which Davenport alleges resulted in off-the-clock work are as follows:   (1) Charter's written punctuality policy requiring agents to be "prepared to begin at work at [their] designated start time," which Davenport alleges required agents to perform logon activities before clocking in so they were prepared to take calls as soon as their shift began; (2) Charter's schedule compliance goal requiring a high percentage, such as 97%, of an agent's clock-in and -out times to match that agent's assigned shift-start and -end times, which Davenport alleges was negatively impacted if agents performed logon and logoff activities while clocked in; and (3) supervisor instructions and training requiring agents to perform logon and logoff activities off the clock so that agents would be fully ready and able to respond to calls from beginning to end of paid shifts.   Davenport asserts that, in accordance with these policies, she regularly observed other agents performing logon and logoff activities off the clock, and Davenport offers declarations from agents employed at call centers outside Missouri stating that they were told by their trainers or supervisors that Charter's policies requiring off-the-clock logon and logoff activities were the same across all of Charter's call centers.

In connection with her argument that supervisors instructed agents to perform logon and logoff activities off the clock, Davenport testified in her deposition that she had six different supervisors during the relevant time period, and at least some of these supervisors told her to have "everything up and ready to go on [her] desk when [she] clocked in."

(Doc. No. 157-1 at 5, 11, 26.)   Davenport testified that while some of her supervisors told her or insinuated that she should "work without pay," some did not.   (*Id.* at 12-13.) Davenport also testified that at least one of her supervisors, Steve Neifert, made "adjustments" to her time card to "ensure that [she was] paid for all [her] time worked" in that department.[3]   (*Id.* at 21).

Davenport testified that agents could clock in using a hard phone and immediately begin getting paid, before logging onto the computer and loading applications, and that clocking in through the hard phone took one minute.   (Doc. No. 157-1 at 13-14.) Davenport testified that agents were "discouraged" from using the hard phone.   (*Id.* at 18.) But at least on one occasion, July 27, 2010, Davenport's supervisor instructed her to "log in using the hard phone, pull up [her] programs and log into the Avaya system.   When [she was] ready to take calls, do a soft phone reset, then go available using the soft phone."   (*Id.* at 48.)   This was in response to an email by Davenport asking her supervisor whether she had to "start the programs before [she could] login and get paid, so [she] actually work[ed] off the clock before 8."   (*Id.* at 48.)   Davenport testified that she was paid for all time worked on July 27, 2010 and that she "understood at least by July 28th, 2010 that [she] could always log into [her] hard phone to begin getting paid right away."   (*Id.* at 20.) However, Davenport also testified that the same supervisor coached her that to meet her

---

[3]    Neifert was Davenport's supervisor both before and after September 2011, the date on which Davenport alleges Charter changed its policy to stop requiring or permitting off-the-clock work.   (Doc. No. 157-1 at 26.)   It is unclear when Neifert made the adjustments to ensure Davenport was paid for all time worked.   (*See id.* at 21.)

schedule compliance goal, she should clock in through the soft phone only after performing logon activities.   (*Id.* at 25.)

In connection with her argument that Charter's schedule compliance goal pressured employees to work off the clock, Davenport states that "[i]t was 'technically feasible' for Agents to load their programs, applications and data during 'aux time,' which is paid time." (Doc. No. 142 at 5.)   After July 2010, agents automatically received three minutes of "buffer" pay for the time spent logging on to the computer before clocking in, and at all relevant times, agents could be put into an "aux" state after clocking in and before clocking out, during which they were paid but were unavailable for calls.   The parties agree that agents who performed logon and logoff activities during "aux" time were on the clock and were paid, but the parties dispute whether using "aux" time for these activities negatively affected agents' schedule compliance scores.

Davenport argues that "Charter repeatedly trained and coached the Agents" not to use paid "aux" time to perform logon and logoff activities because doing so "prohibited the Agents from achieving their 'compliance' requirement."   (Doc. No. 142 at 5.)   Davenport also offers two Charter memoranda, dated October 6, 2008 and January 6, 2010, which both state as to Charter's policies regarding "aux" time:

> Agents should be at their desk no earlier than the time their shift begins.   At this time, the agent should log into the computer.   Once logged into Windows, log into the Avaya soft phone first (which will also log into hard phone).   As the agent logs into other required programs, the agent may go into Auxiliary (AUX) status in the soft phone to avoid taking calls until those programs are available.   If the agent is at his or her desk and unable to log into the Avaya soft phone, the agent should log into the hard phone (to indicate they are at their position) and contact the supervisor so an exception

can be entered into eWFM.   If no exception is entered, the agent's compliance will be impacted as the agent will be in AUX while logging into the computer.

**Grace Period**
Agents are provided a 5-minute grace period for all Real Time Adherence (RTA) alarms, including the start of each shift (no exceptions should be entered if the agent is not more than five minutes late).   Agents logging in more than 5 minutes after their start time will be counted as late.   If logging in late is due to a computer not being available, a delay due to latency, or other technical issues, agents will log into their hard phone immediately to allow for appropriate time tracking.   Agents who log in late for one of these reasons, and who are concerned about being noted as late, should contact their supervisor who will review the phone log in time, inform the agent of the finding and, where appropriate, have an exception posted in eWFM by the local WFM team.

***

**Exceptions**
Exceptions should be posted in eWFM RTA only when an agent is late by more than five minutes (1) due to the request of management, or (2) because the agent was on a call longer than the end of the agent's shift, or (3) when the agent's break has been moved.   When an agent exceeds the 5-minute grace period, the agent should notify their supervisor, who will notify local WFM.   If the reason for exceeding the grace period was system related the local WFM group will enter a code to the reflect [*sic.*] system was down. (Note that exceeding a grace period will impact compliance, but may not impact agent pay – pay determinations are made separately).

(Docs. No. 144-13 at 2-3 & 144-14 at 2-3.)

Davenport argues that the statement that "[i]f no exception is entered, the agent's compliance will be impacted as the agent will be in AUX while logging into the computer" demonstrates that any time spent in the paid "aux" state, even the five-minute grace period, negatively affected an agent's schedule compliance score.   Davenport also offers the deposition testimony of Charter's corporate representative that "[t]he only way AUX time

can negatively impact compliance if [*sic.*] there is not an exception that gets enter [*sic.*] to account for the time.   I will say, going back to what I said earlier, AUX zero or default AUX will not negatively impact compliance."   (Doc. No. 142-2 at 28.)   Davenport argues that because exceptions were not available to account for logon and logoff activities, absent technical difficulties, using any paid "aux" time to perform such activities negatively impacted schedule compliance.

Davenport testified in her deposition that, consistent with the 2008 and 2010 Charter memoranda quoted above, Charter's official policy was that, after clocking in, agents would have a five-minute grace period of on-the-clock, paid "aux" time in order to load their programs without being deemed late.   (Doc. No. 157-1 at 12.)   However, Davenport testified that she was also told in "[e]very coaching every week" that "[i]f [she] use[d] that five minutes in the morning when [she] log[ged] in, there's no way [she could] make [schedule] compliance for the rest of the day."   (*Id.*)   The declarations of agents Fenerson and Mason in Plaintiffs' notice of newly-discovered evidence appear to go further than Davenport to argue that, not only were agents trained to avoid using "aux" time in order to meet schedule compliance goals, but Charter's official policy of providing a five-minute grace period of paid "aux" time during which employees would not be deemed late was not even instituted until after the close of the class period in September 2011.   (Doc. No. 250-2 & Doc. No. 250-3.)

Charter responds that the Fenerson and Mason declarations in Plaintiffs' notice of newly-discovered evidence contradict Davenport's own testimony and the 2008 and 2010

Charter memoranda Davenport attached to her class certification motion, which all referenced the five-minute grace period as existing prior to September 2011.   And Charter offers the declarations of other agents who testified that they were provided a five-minute grace period to perform logon and logoff activities before September 2011.

Charter also disagrees with Davenport's argument that using any paid "aux" time negatively affected an agent's schedule compliance.   According to Charter, the only way a schedule compliance score was affected was if the agent was in the "aux" state for longer than five minutes without an "exception," and Charter's "aux" policy specifically allowed agents to report technical difficulties as an "exception" to avoid any negative impact on schedule compliance scores.   However, Charter does not appear to contest that, absent technical difficulties, spending more than five minutes of paid "aux" time to complete logon and logoff activities would negatively affect agents' schedule compliance (though not their pay).

In any event, Charter disputes that any of the above mentioned policies required or permitted agents to work off the clock.   Rather, Charter maintains that it employed written policies explicitly prohibiting off-the-clock work.   One of these is Charter's timekeeping policy, which states that "[h]ourly employees may not under any circumstances, work 'off the clock' (e.g., during meal periods or outside of the regular work schedule).   If an hourly employee performs work during a meal break or before or after the regular work schedule and failed to obtain advance authorization from the supervisor, the employee must still report all of the hours worked and will be compensated."   (Doc. No. 157-2 at 15.)

Another such policy is Charter's Code of Conduct, which prohibits managers and supervisors "from directing or encouraging nonexempt employees to misstate hours worked on their timesheets," and which directs employees that they "may not, under any circumstances, work 'off the clock,'" defined as "work that is performed but that is not reported on your timesheet."   (Doc. No. 157-1 at 38.)   Finally, Charter requires each of its employees to certify on his or her time records that "I have accurately and completely reported on this timesheet all hours that I worked during this pay period . . . ."   (Doc. No. 157-1 at 45.)

Charter submits several declarations of putative class members in support of its opposition to class certification ("new declarations").   Of these, only seven relate to the Missouri Claims.   These are the declarations of Steve Blumer (Doc. No. 156-4), Sharon Hubbard (Doc. No. 156-15), Vincent McWilliams (Doc. No. 156-20), Jason Richardson (Doc. No. 156-23), Julie Saletto (Doc. No. 156-25), Sean Schroeder (Doc. No. 156-26), and Roger Terry (Doc. No. 156-27).   All of these declarants insist that Charter has trained them to record their hours worked accurately and has prohibited them from working off the clock, in accordance with Charter's timekeeping policy; that they have never interpreted Charter's punctuality policy to require off-the clock-work; and that they have never considered it necessary to perform logon or logoff activities off the clock in order to meet schedule compliance goals.   Almost all of them also assert that they were offered a five-minute grace period, which was sufficient to complete all logon and logoff activities, and that if there was any delay or technical issue requiring them to spend more than five

minutes performing logon or logoff activities, they were able to report the issue and receive an exception.   Charter also refers to declarations of putative class members previously submitted in support of its earlier-filed oppositions to conditional certification of Plaintiffs' FLSA claim ("old declarations").   (Docs. No. 31 & 94.)   The old declarants similarly insist that they were never trained or instructed to perform logon or logoff activities off the clock.

Two of the old declarants are Fenerson and Mason, who, as discussed above, have now provided contrary evidence as part of Plaintiffs' notice of newly-discovered evidence. In response to Plaintiffs' notice of newly-discovered evidence, Charter also provides supplemental declarations from some of the old declarants reaffirming that they were never trained or instructed to perform logon or logoff activities off the clock, that they were at all relevant times afforded a five-minute grace period of "aux" time to perform logon and logoff activities on the clock without being deemed late, and that they never believed that performing logon or logoff activities during paid "aux" time prevented them from meeting their schedule compliance goals. (*See* Doc. No. 289.)

Plaintiffs move separately to strike the old declarations[4] and the seven new declarations relating to the Missouri Claims.   Plaintiffs ask the Court to strike the new declarations because Charter failed to disclose these witnesses in its initial Rule 26(a)(1)

---

[4]     Although Plaintiffs' motion to strike asks the Court to strike both the new and old declarations, at oral argument, Plaintiffs' counsel appeared to treat the motion as directed toward only the new declarations, without mentioning the old declarations.   Nevertheless, the Court will address the motion's broader request to strike both the new and old declarations.

disclosures or in any supplement thereto, and only identified the witnesses after Plaintiffs

filed their motion for class certification.   Plaintiffs argue that because Charter employed

all of the witnesses, it could and should have identified them earlier, and by failing to do so,

Charter denied Plaintiffs a fair opportunity to depose the witnesses or test their evidence

before briefing on the motion for class certification closed.   Plaintiffs also ask the Court to

strike the old declarations on the ground Charter has refused to produce discovery

pertaining to these previously-disclosed witnesses, and the withheld information is needed

to effectively depose these witnesses.

Charter does not dispute that the new declarants were not disclosed in its Rule

26(a)(1) disclosures, or any supplement thereto, but asserts that almost all of the new

declarants were disclosed through other discovery and prior court filings.   Charter also

challenges Plaintiffs' assertion of prejudice by pointing out that Plaintiffs have never

attempted to depose the new declarants, including during the 30-day extension of time the

Court granted Plaintiffs to file their reply in support of class certification.   With respect to

the old declarants, Charter argues that Plaintiffs never specifically requested discovery

with respect to these witnesses, instead only issuing broad requests for documents

regarding all potential class members; Plaintiffs never moved to compel the withheld

discovery; and Plaintiffs never sought to depose these witnesses either.

## DISCUSSION

### Plaintiffs' Motion to Strike

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."   Fed. R. Civ. P. 37(c)(1).   In determining whether a Rule 26(a) violation is "substantially justified or harmless," courts are directed to consider "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."   *Rodrick v. Wal-Mart Stores East, L.P.*, 666 F.3d 1093, 1096-97 (8th Cir. 2012) (internal citations and quotations omitted).

Under the Federal Rules of Civil Procedure, the failure to make a timely disclosure is equivalent to a failure to disclose.   *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998).   In addition, an incomplete or evasive disclosure is treated as a failure to disclose.   *See* Fed. R. Civ. P. 37(a)(4).   "When a party fails to provide information or identify a witness in compliance with Rule 26(a) . . . the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008).

The Court finds that Charter satisfied its disclosure obligations with respect to two of the new declarants, Jason Richardson and Roger Terry, who were previously disclosed by way of declarations in support of Charter's opposition to Plaintiffs' motion for conditional certification, filed on March 21, 2012.   (Doc. No. 31-2 at 6-9 & Doc. No. 31-9 at 26-30.)   The Court concludes that these prior declarations sufficiently identified

- 13 -

Richardson and Terry as individuals with discoverable information, the subjects of that information, and Charter's intent to rely on that information in accordance with Rules 26(a)(1)(A) and (e)(1)(A).   *See* Fed. R. Civ. P. 26(e)(1)(A) (requiring a party to supplement its Rule 26(a) disclosure "if the additional or corrective information *has not otherwise been made known to the other parties during the discovery process or in writing*") (emphasis added).   Furthermore, Plaintiffs concede that previously disclosed declarations satisfy disclosure obligations under Rule 26(a)(1)(A) and 26(e)(1)(A) because Plaintiffs state in their reply brief that their own disclosure obligations were satisfied by such prior declarations.   *See* Doc. No. 171 at 8-9 ("In accordance with Rule 26(e)(1)(A), each time that Plaintiffs identified a person whose knowledge they intend to use to support their claims, Plaintiffs promptly provided Defendants a sworn declaration describing that person[']s relevant knowledge.").

Charter argues that four more of the new declarants, Steve Blumer, Vincent McWilliams, Sean Schroeder, and Julie Saletto, were also previously disclosed in an organizational chart and/or other documents produced by Charter in discovery.   The organizational chart includes Blumer, McWilliams, and Schroeder's names and job titles, along with a few other employees, and the other documents are training attendance sheets listing the names of the declarants among numerous other employees but with no additional identifying information.    (Doc. No. 169-1 at 3-4, 9-24.)   The Court is not convinced these documents sufficiently identified the four declarants, or that they provided Plaintiffs with sufficient notice of the discoverable information possessed by the declarants

or Charter's intent to rely on that information.   And Charter does not contend that it ever previously disclosed the remaining new declarant, Sharon Hubbard, through prior discovery or otherwise.

Nevertheless, the Court concludes that Charter's tardy disclosure of these new declarants did not prejudice Plaintiffs.   After receiving Charter's opposition to class certification, and the new declarations in support thereof, Plaintiffs sought and were granted a 30-day extension of time in which to file their reply in support of class certification, but Plaintiffs' motion did not mention the new declarations or assert any need for discovery relating to the new declarants.   (Doc. No. 159.)   Nor did Plaintiffs seek to depose the new declarants during the extended period of time before which their reply was due, or seek any further extension of time to complete such depositions.   Had Plaintiffs done so, they could have cured the prejudice they now claim to suffer.

Plaintiffs suggest that they did not request depositions prior to filing their reply brief because it was unrealistic for Plaintiffs' counsel to take 28 depositions prior to filing their reply brief, and because Charter refused to produce the documents necessary for Plaintiffs to conduct any meaningful depositions.   Plaintiffs also rely on Charter's refusal to produce documents as the basis for their motion to strike the old declarations.

The Court is mindful that, at the time the motion for class certification was being briefed, the number of new declarations at issue was much greater.   But given that Plaintiffs also never sought to depose the old declarants, many of whose identities Plaintiffs have known since March 21, 2012, the Court doubts whether Plaintiffs would

have deposed any of the new declarants even if they were identified earlier.   Moreover, to the extent Plaintiffs required additional documents to depose either the old or new declarants, their proper recourse, after attempting in good faith to reach agreement with defense counsel, was a motion to compel.   Plaintiffs' failure to file such a motion, or to otherwise seek those documents specifically related to the new and old declarants, undercuts their claim of prejudice.   For these reasons, the Court does not find that sanctions are warranted with respect to either the new or old declarations, and the Court will deny Plaintiffs' motion to strike.

## Plaintiff Davenport's Motion for Class Certification Under Rule 23

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.   To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23."   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citations omitted). Rule 23(a) sets out four threshold requirements for class certification – (1) sufficiently numerous parties, (2) common questions of law or fact, (3) typicality of claims or defenses, and (4) adequacy of representation.   *See* Fed. R. Civ. P. 23(a).   A class action plaintiff "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 133 S. Ct. at 1432.   The provision at issue here is Rule 23(b)(3), which requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy."   Fed. R. Civ. P. 23(b)(3).   In order to obtain class certification, Plaintiffs

have "the burden of showing that the class should be certified and that the requirements of

Rule 23 are met."   *Luiken v. Domino's Pizza*, *LLC*, 705 F.3d 370, 372 (8th Cir. 2013)

(citation omitted).

The Court's analysis will focus on the commonality requirement of Rule 23(a)(2)

and the predominance and superiority requirements of Rule 23(b)(3).   Charter does not

dispute that the proposed class is sufficiently numerous.   Charter does argue that

Davenport cannot demonstrate typicality, but for largely the same reasons that she cannot

demonstrate commonality.   The only unique typicality argument Charter raises, which

Charter also raises to contest adequacy of representation, is that because some agents in the

Town & Country call center were already compensated by Charter for off-the-clock work,

these putative class members may be subject to defenses that do not apply to Davenport.

In light of the Court's disposition today, it need not address this contention.

Additionally, some of the arguments Charter raises in opposition to class

certification are no longer pertinent as they are directed at Plaintiffs' Kentucky and

Michigan class claims that have since been dismissed by the Court.   (Doc. No. 218.)   As

such, this Court will address only those objections directed to the remaining Missouri

Claims.

### Class Definition

At oral argument, Charter agreed that its prior objection to the class definition in this

case is no longer at issue in light of the parties' agreement regarding the definition of the

proposed opt-in class under the FLSA.   The FLSA class definition may be modified to

define the Missouri class as follows:

> All persons who, from the beginning of the relevant statutes of limitations[5]
> through September 1, 2011, worked as a nonsupervisory hourly employee
> whose primary duty was to respond to incoming customer calls from a queue
> on Charter's toll-free lines, commonly referred to as "advisors,"
> "representatives," or "agents," who were hired and had completed training
> before September 1, 2011, and who worked at Charter's call center located in
> Town and Country, Missouri, but excluding persons who were hired by
> Charter but worked only as trainees.

This definition would exclude hourly employees with job titles such as Escalation

Specialists and Tier 2 employees, who according to Charter's evidence, took escalation

calls from Charter employees or technicians but did not respond to customer calls through

a queue (Doc. No. l56-20 at 4 & Doc. No. 156-23 at 4), and would also exclude Senior

Advisors and Customer Service Leads, who did not take incoming calls.   (Doc. No. 156-4

at 4 & Doc. No. 156-12 at 1-2).[6]

### Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance

Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact

common to the class."   Fed. R. Civ. P. 23(a)(2).   As the Supreme Court has explained,

"any competently crafted class complaint literally raises common questions," but "[w]hat

---

[5]    The relevant statutes of limitations are two years for Missouri Minimum Wage Law
claim, and five years for breach of contract, quantum meruit, and unjust enrichment claims.
*See* Mo. Rev. Stat. §§ 290.527, 516.120.

[6]    Charter offers evidence that these other hourly positions, which did not involve
responding to customer calls through a queue, may not have been subject to Charter's
schedule compliance goals.   (Doc. No. 156-1 at 24.)   Under the more limited class
definition, this evidence is irrelevant.

matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original) (citations omitted).   In other words, Plaintiffs' claim must "depend upon a common contention . . . of such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [individual plaintiff's] claims in one stroke." *Luiken*, 705 F.3d at 377 (quoting *Dukes*, 131 S.Ct. at 2551).   Even a single common question that meets this standard satisfies Rule 23(a)(2), and where Plaintiffs identify at least one common question, differences between class members' claims are less relevant.   *Dukes*, 131 S. Ct. at 2556 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there *is* even a single common question.") (emphasis in original).

The Rule 23(b)(3) predominance inquiry is "far more demanding than the requirement of commonality."   *Luiken*, 705 F.3d at 377 (citation omitted).   Rule 23(b)(3) "permits certification only if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast*, 133 S. Ct. at 1430.   "The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member."   *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d

773, 778 (8th Cir. 2013) (citing *Avritt v. Reliastar Life Ins. Co*., 615 F.3d 1023, 1029 (8th Cir. 2010)).

The Court finds that while Davenport has arguably demonstrated commonality, she fails to demonstrate predominance.   As discussed above, Davenport argues that Charter employs several policies and practices that systematically result in agents performing logon and logoff activities off the clock in order to maximize their time on the telephone. Davenport proffers evidence that at least some of the policies about which she complains, namely Charter's official policies regarding punctuality and schedule compliance, were commonly applied to all class members, and that spending paid "aux" time on logon and logoff activities, absent technical difficulties, would commonly lower all class members' schedule compliance scores to some degree.  *See, e.g., Ginsburg v. Comcast Cable Commc'ns Mgmt. LLC*, No. C11-1959RAJ, 2013 WL 1661483, at *4 (W.D. Wash. Apr. 17, 2013) (holding that commonality, unlike predominance, was satisfied where "[t]he classwide practice at issue is Comcast's alleged pressure to maximize time spent on the telephone and minimize other types of work[, and] Plaintiffs have provided some evidence of that pressure, and some evidence that upper management applied that pressure in such a way that it reached [call center agents]"); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 525 (C.D. Cal. 2011) ("Applying *Dukes*, several courts have found that the fact an employee challenges a policy common to the class as a whole creates a common question whose answer is apt to drive the resolution of the litigation.") (citing *Dukes*, 131 S.Ct. at 2551 and subsequent cases).

- 20 -

However, the central question of liability in this case is not whether Charter's policies were commonly applied but whether the policies commonly *resulted in* agents performing logon and logoff activities off the clock.   *See* Mo. Rev. Stat. ' 290.527 (creating right of action only where employer "pays any employee less wages than the wages to which the employee is entitled").   Unlike many of the cases cited by Davenport, including those involving donning and doffing at meat processing plants, in this case, Davenport does not allege that Charter's compensation system inherently fails to account for logon or logoff activities.   Nor could she.   Charter's compensation policies expressly require that agents account for, and are paid for, all work performed, including logon and logoff activities, and expressly prohibit supervisors from directing or encouraging agents to misstate hours worked on their timesheets.   *Cf. Bouaphakeo v. Tyson Foods, Inc*., 564 F. Supp. 2d 870, 909 (N.D. Iowa 2008) (certifying class where plaintiffs purported to demonstrate by "common evidence that Tyson's compensation system cannot account for even the basic or standard [protective equipment] employees need to don, doff, and clean," and such evidence "would establish a prima facie case for the class"), *aff'd*, No. 12-3753, __ F.3d __, 2014 WL 4197378 (8th Cir. Aug. 25, 2014); *Perrin v. Papa John's Int'l, Inc.*, No. 4:09CV01335 AGF, 2013 WL 6885334, at *7 (E.D. Mo. Dec. 31, 2013) (certifying class based on plaintiffs' common evidence that "Defendants' vehicle reimbursement policy [did] not reasonably approximate Plaintiffs' vehicle expenses," which would prove class-wide liability under state wage laws).

Rather, Davenport's theory of liability is that certain de facto policies, namely, Charter's practices emphasizing punctuality and schedule compliance, indirectly resulted in off-the-clock work.   In support of that theory, Davenport puts forth evidence that, at best, suggests that she and some of her fellow agents responded to the pressures of Charter's punctuality and schedule compliance policies by working off the clock, and that they were instructed and trained to do so by some, but not all, of the supervisors at Charter's Town & Country call center.[7]

Even without reaching any contrary evidence, Davenport's is the very kind of individualized evidence that precludes certification under Rule 23(b)(3).   Proof that some agents were individually pressured to and did work off the clock in response to Charter's punctuality and schedule compliance policies does not prove liability on behalf of the class as a whole.   When the Court also considers Charter's evidence, suggesting that some agents never performed logon and logoff activities off the clock, were never trained or instructed to do so, did not believe that off-the-clock work was necessary to meet punctuality or schedule compliance goals, and were able to complete logon and logoff activities within a five-minute grace period to avoid being deemed late, or receive exceptions for delays exceeding five minutes, it only confirms that the questions critical to

---

[7]   The Court notes that Davenport's evidence also suggests that some of her supervisors did not instruct her to work off the clock, that at least one supervisor made adjustments to her timecard to ensure that she was paid for all time worked, that it was possible to clock in through the hard phone to avoid working off the clock, and that though some supervisors discouraged her from clocking in through the hard phone, at least one of her supervisors instructed her to do so.   Therefore, even with respect to Davenport alone, Charter's alleged de facto policies were not uniform but varied at least to some degree.

resolution of the putative class members' claims are not susceptible to classwide proof.   In

short, Davenport has not shown that she will be able to demonstrate, on a classwide basis,

that Charter's policies commonly resulted in off-the-clock work.   *See, e.g., Pryor*, 278

F.R.D. at 532 ("[W]hile the policies about which Pryor complains are common, how those

policies affect members of the class depends on the individual circumstances of each

Aerotek employee.   Once the factfinder determines what Aerotek's policies are, that does

not answer the ultimate question in the case—whether Aerotek's time reporting policies

resulted in the undercompensation of and failure to pay overtime to putative class

members.   This is not merely a question of damages, it is a question of liability.");

*Ginsburg*, 2013 WL 1661483, at *6 ("Even if the court considered only Plaintiffs'

anecdotal evidence, it would likely conclude that the common questions Plaintiffs raise do

not predominate over questions about what policies Comcast's many supervisors imposed

on [call center agents], and the many ways in which [agents] responded to those policies,"

and Comcast's "own anecdotal evidence, consisting of 50 declarations from its current

[agents] . . . insist[ing] that Comcast has trained them to record their work time accurately

and has forbidden them to work off the clock[,] [and] . . . assert[ing] that the 'preshift'

period is adequate to complete all preliminary work" further demonstrates "that many of

the questions critical to the resolution of class members' claims are not susceptible of

classwide proof."); *Coleman v. Jenny Craig, Inc.*, No. 11cv1301–MMA (DHB), 2013 WL

6500457, at *6, *8, *13 (S.D. Cal. Nov. 27, 2013) (holding that plaintiffs' claim that they

had to work off the clock to fulfill defendant's policies to "never turn a client away" and to

"make sure there are always two staff members in the Centre at all times," notwithstanding written policy forbidding off-the-clock work, could not satisfy commonality or predominance because it required "individualized assessment" that was "not susceptible to common proof").

Davenport correctly asserts that the Court need not resolve at the certification stage whose declarants are more credible or more representative of the class; that is a question for the jury.[8]   But the Court does need to resolve at this stage whether the nature of the evidence required to prove the Missouri Claims "will vary from class member to class member."   *Doyel v. McDonald's Corp.*, No. 4:08-CV-1198 CAS, 2010 WL 3199685, at *4 (E.D. Mo. Aug. 12, 2010).   That is the "key factor" courts look to "in assessing whether common issues predominate over individual issues."   *Id*.   And where, as here, plaintiffs "will need to present evidence that varies from class member to class member" in order "[t]o establish their claims," they "cannot satisfy Rule 23(b)(3)."   *Id.* at *5 ("[P]laintiffs' off-the-clock allegations would require the Court to look at each shift of each class member and determine whether that employee worked off the clock, for how long, and did he report the time worked. Plaintiffs offer the Court no answer to resolve the off-the-clock claim on a classwide basis[.]").

---

[8]   For this reason, the Court also need not address Plaintiffs' argument that Charter's declarants who provided supplemental testimony in response to Plaintiffs' notice of newly-discovered evidence are not credible because their declarations contained certain inaccuracies regarding when the lawsuit was filed and whether any decisions or rulings have been made with respect to it.   (*See* Doc. No. 290 at 3-4 & Doc. No. 293.)

Davenport also rests heavily on her assertion that this Court and others have certified state law claims for unpaid overtime wages resulting from de facto policies and practices requiring off-the-clock work, notwithstanding the presence of written policies forbidding off-the-clock work.   But the Court does not rest its decision on the presence of Charter's written policies forbidding off-the-clock work.   The Court agrees that if Davenport demonstrated that she would be able to put forth evidence that any of the punctuality or schedule compliance policies or practices at issue commonly resulted in off-the-clock work, she may be able to show commonality and predominance, regardless of Charter's facially compliant timekeeping policy, code of conduct, and timesheet certification requirement.   But as discussed above, Davenport has not made this showing. Therefore, the cases she cites are distinguishable.   *See, e.g., Rikard v. U.S. Auto Protection, LLC*, 287 F.R.D. 486, 490-93 (E.D. Mo. Nov. 30, 2012) (recognizing its decision was a "close one" but holding that because plaintiffs demonstrated that "they will be able to adduce generalized proof [that] Defendants' company-wide practices and procedures" of "managers allegedly encouraging and/or requiring Plaintiffs to work beyond their shifts in order to meet established sales goals" resulted in class-wide overtime, the fact that plaintiffs "allege to have worked differing *amounts* of overtime" under "different payment plans" and "different managers" did not defeat certification) (emphasis added); *Nicholson v. UTi Worldwide, Inc.*, No. 3:09-cv-722-JPG-DGW, 2011 WL 1775726, at *8 (S.D. Ill. May 10, 2011) (pre-*Dukes* case holding that where the "Court is confident the parties can devise some way of presenting . . . evidence in an efficient,

- 25 -

admissible form" to commonly demonstrate that defendant had "uniform policies of requiring or allowing work without pay," class certification was appropriate, notwithstanding individual issues regarding amounts of damages).[9]

### Rule 23(b)(3) Superiority

The second inquiry under Rule 23(b)(3) requires courts to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy," considering:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).   The Court notes that, in relation to the first factor, "there is evidentiary value to the fact that [several] employees have affirmatively opted in to the FLSA claim rather than filing their own suits." *Rikard*, 287 F.R.D. at 493.   Nevertheless, for the reasons discussed above, and particularly with regard to the last factor, a class action would not be the superior method for resolving the claims of all Charter agents at the Town & Country call center for unpaid overtime wages.   Without common proof of

---

[9]      Davenport also cites cases involving unopposed motions for class certification for settlement purposes where there was less discussion of evidence rebutting plaintiffs' assertion of a policy uniformly resulting in unpaid overtime.   *See, e.g., Simmons v. Enter. Holdings, Inc.*, No. 4:10CV00625 AGF, 2012 WL 718640, at *1-2 (E.D. Mo. Mar. 6, 2012); *Kritzer v. Safelite Solutions, LLC*, No. 2:10-cv-0729, 2012 WL 1945144, at *3-4 (S.D. Ohio May 30, 2012).   Because in this case Charter puts forth evidence that the policies did not commonly result in unpaid overtime for putative class members, Davenport's reliance on these cases is misplaced.

policies resulting in work without pay, the litigation would devolve into a series of mini-trials involving each class member's interpretation of, training regarding, and response to the punctuality and schedule compliance policies, which contravenes the efficiency goals of class certification.   *See Doyel*, 2010 WL 3199685, at *9 (finding no superiority where case "would devolve into a series of mini-trials for each class member and each instance of alleged time shaving or off-the-clock work.").

<u>**CONCLUSION**</u>

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' motion to strike is **DENIED**.   (Doc. No. 165.)

**IT IS FURTHER ORDERED** that Plaintiffs' motion to certify Counts II through V (Missouri Claims) of the first amended complaint as a class action is **DENIED**.   (Doc. No. 140.)

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2014.