UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PENNY DAVENPORT, individually and on behalf of a class of others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>   Defendant. | No. 4:12-cv-00007-AGF |

## DECLARATION OF NEVA MCLEAN

I, Neva McLean, and pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am over the age of 18 and competent to testify to the matters set forth herein. I have been asked to make this declaration based on my personal knowledge of the statements included in this declaration.

2. On Friday, November 6, 2015, I met with Tabitha Davisson. I understand that Ms. Davisson represents Charter Communications, LLC ("Charter") in a collective action brought against it by Penny Davenport and others alleging violations of wage and hour laws. I understood that Ms. Davisson is not my attorney. Finally, I provided this information voluntarily.

3. I began working with Charter in a local office for a couple of years and then moved to the Vancouver, Washington call center in 2001. When I started working in the call center I was a Supervisor. The Vancouver call center has handled different kinds of calls while I have been a Supervisor. The call center handled Retention and Sales calls and later switched to

Billing. When the call center handled Retention and Sales calls, I was a Sales Supervisor. I believe I was a Sales Supervisor during the 2009 to 2011 time period. I am currently a Supervisor in Billing at Charter's Vancouver location.

4. I when I was a Supervisor in Sales, my job duties were pretty broad. I took escalated calls, coached Reps, completed trainings, held team meetings, and assisted Reps achieve their metrics and do the best job they could. As a Supervisor in Sales, I had to be familiar with Charter's policies and procedures. I went over policies and procedures with my Sales Reps and sometimes my team attended larger team meetings to discuss changes to Charter's policies and procedures. When I was a Supervisor in Sales, I typically had 15-18 Reps on my team at any given time. The Reps on my team varied in terms of experience. Some had been with Charter for years and some were new hires.

5. If I had a new Rep assigned to my team, the Rep would complete training prior to being assigned to me. Training for my Sales Reps included both classroom training and nesting. In nesting, trainers assisted the new hires for a couple of weeks when new hires first take customer calls and implement what they learned in the classroom portion of the training. Prior to joining my team, a new hire would learn how to log into and out of the timekeeping system as well as the computer and any applications needed to assist customers.

6. The log in procedure during my time as a Sales Supervisor from 2009 to 2011 changed, but under either procedure, the first thing a Rep would do is to log into the hard or soft phone (the timekeeping system). Under either procedure, it was clear that clocking in was to be done before pulling up any programs or applications needed to assist customers.

7. My Sales team and I received the attached email from Scott Carroll in December of 2009 attached as Exhibit 1. The email reminded me and my team that the process for logging

in was to log into the computer and then clock in via the soft phone before pulling up any programs. The email also indicated that the hard phone could be used as a backup. The process described in the email is consistent with how my team was logging in at that time. Scott's email did not contain a change to the log in procedure. It was only a reminder on the process. As a Supervisor, it was part of my process to go over emails and policies such as the attached December 2009 email from Scott with my team during a team meeting.

8. I also received another email from Scott Carroll in August 2010 regarding a change in the log in procedure in the Vancouver call center. My team members received it as well. The email is attached as Exhibit 2. Scott's email indicated that the call center was changing to flex seating and announced a preference for logging in via the hard phone prior to touching the computer or pulling up any programs or applications. I remember that the change in the preference for log in method was in connection with starting flex seating. Scott attached a revised log in policy that indicated that Reps should log into the hard phone first. Once again, it was clear from Scott's email and the attached policy that Reps should log into the hard phone before pulling up their computers, programs, or applications. I would have gone over this change with my team at the time.

9. I went over the log in process with my team during team meetings. Even if the procedures varied, I recall that during the 2009 to 2011 time period, I stressed that no programs should be brought up prior to logging in on either the soft phone or the hard phone. I remember the log in policy was important to me and to Charter during the 2009 to 2011 time period. It was important because clocking in before starting work was the way that Reps were paid. I understood that it was important and Charter's policy that work should be reflected on a Reps'

timecard. I considered pulling up programs, such as the billing program or work email, to be work that needed to be done on paid time because those activities were part of a Reps' job.

10. If Reps followed the policy for logging in and out during the 2009 to 2011 time period, there would be no negative impact to performance metrics for that person. I really do not know why someone would try to go on his or her computer prior to clocking in to pull up programs or applications without first clocking in. That behavior does not make sense to me.

11. My Reps were good about following the log in policy. I was present at the start of my Reps' shift and I looked for anyone attempting to do any work on the computer prior to clocking in via the hard or soft phone. I recall asking my Reps if they were logged in at the beginning of shifts and hearing other Supervisors ask their Reps the same questions.

12. Logging out at the end of shift had a similar rule that all work should be done while on the clock. Any clean up or final work at the end of the shift should be done on the clock. Reps should have continued working until their scheduled stop time and then log out end of shift on the soft phone on the computer. It was emphasized during my time as a Sales Supervisor that clocking out should be the last thing done and that any work needed to be completed prior to clocking out.

13. I never told any of my team members to access programs before clocking in. I also never told any of my team to shut down the programs after clocking out. I told my team over and over again that they should do all work on the clock. If I ever saw any of my team on the floor during a time outside of their scheduled work time, I told them to leave the floor. It's common sense that Reps should get paid for their work and they should want to do all work on paid time. I feel the same—I want to be paid for everything I do that is work-related.

14. I told my team members about the policies for logging in and out of Charter's timekeeping procedures in other Charter call centers because I do not know about them.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 6th day of November, 2015.

*Neva McLean*

Neva McLean