UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PENNY DAVENPORT, RITA GENTRY, ANGELA NELSON, and JOSHUA WESTMAAS, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 4:12CV00007 AGF |

## MEMORANDUM AND ORDER

Named Plaintiffs Penny Davenport, Rita Gentry, Angela Nelson, and Joshua Westmaas, brought this action on behalf of themselves and similarly situated call center agents employed on an hourly basis at Defendant Charter Communications, LLC's ("Charter") eight customer service call centers nationwide.   Plaintiffs' amended complaint, filed on August 7, 2012, alleged that Charter violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; the state wage-and-hour laws of Missouri, Kentucky, and Michigan; and Missouri common law, by failing to pay Plaintiffs for the time it took to start their computers and load the required programs and applications ("tools") when beginning work, and to close their tools and shut down their computers at the end of work.

Plaintiffs subsequently moved for conditional collective action certification under the FLSA, which the Court granted on March 27, 2014.   (Doc. No. 172.)   Following conditional certification, notice of this lawsuit was sent to 5,680 current and former call

center agents, and approximately 806 individuals opted in to the collective action (the "Opt-In Plaintiffs").

After conditional certification, the parties engaged in discovery, and on September 30, 2014, on the basis of a somewhat fuller record, the Court denied Plaintiffs' motion to certify the Missouri claims as a class action.[1]   The Court found that the evidence put forth by Davenport, the named Plaintiff seeking to represent the Missouri class, was too individualized to satisfy the "demanding" standard of Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."   (Doc. No. 294.)

Shortly after the Court's denial of Rule 23 certification, and before the close of discovery, Charter moved to decertify the FLSA collective action.   However, the Court granted Plaintiffs' request to deny that motion without prejudice to refiling after the close of discovery, based on Plaintiffs' representation that discovery would likely reveal evidence of a uniform overtime violation that would satisfy the standard to litigate collectively under the FLSA (which courts have held is less stringent than Rule 23(b)(3)).

---

[1]     The Court also previously granted Charter's Motion for Judgment on the Pleadings (Doc. No. 218) as to Plaintiffs' request for class relief in their claim under the Kentucky Wages and Hours Act, and as to Plaintiffs' individual and class claims under the Michigan Minimum Wage Law.   Therefore, the only claims remaining are Plaintiffs' collective action under the FLSA (Count I); Davenport's individual claims under the Missouri Minimum Wage Law, Mo. Rev. Stat. § 290.500, et seq. (Count II) and Missouri common law (Counts II-V); and Gentry's individual claim under the Kentucky Wages and Hours Act, Ky. Rev. Stat. § 337.010, et seq. (Count VI).

Discovery has now closed, and on the basis of a complete evidentiary record, Charter has again moved to decertify the FLSA collective action.   (Doc. No. 410.)   The parties submitted lengthy briefs, and the Court held oral argument on January 31, 2017. After careful consideration, and for the reasons set forth below, the Court will grant Charter's motion for decertification.

## **BACKGROUND**

Charter, a broadband service provider, operates eight customer service call centers around the country.[2]   Plaintiffs were employed by Charter as call center agents at all eight call centers during the relevant time period, from September 25, 2009 to August 31, 2011.[3] As call center agents, Plaintiffs were nonsupervisory hourly employees whose primary duties were to respond to incoming calls from customers on Charter's toll-free lines. Plaintiffs were generally scheduled to work 40 hours per week.

During the relevant time period, there were two methods by which call center agents could clock in and out of Charter's timekeeping system, to record their compensable time. The first method, which was the preferred method under Charter's written policies, was through a "soft phone" connected to the agents' computers.   This method required agents to first start their computers and then punch in a five-to-ten-digit numerical code in the soft

---

[2]      The call centers are located in Missouri, Michigan, Kentucky, South Carolina, Washington, Minnesota, Wisconsin, and Massachusetts.

[3]      Plaintiffs allege that Charter remediated its overtime pay practices beginning in September 2011.

phone in order to clock in, and correspondingly, to clock out through their soft phones before shutting down their computers at the end of their shift.

The second method by which agents could clock in was through a "hard phone" unconnected to the agents' computers.   This method allowed agents to punch the numerical code into the hard phone immediately at the start of their shifts, without having to first start their computers, and to clock out through the hard phone after shutting down their computers.

Charter's written compensation policies throughout the relevant period required call center agents to account for, and to be paid for, all time worked, including time spent loading and closing tools.   For example, Charter's timekeeping policy stated that "[h]ourly employees may not under any circumstances, work 'off the clock' (e.g., during meal periods or outside of the regular work schedule). . . . If an hourly employee performs work during a meal break or before or after the regular work schedule and failed to obtain advance authorization from the supervisor, the employee must still report all of the hours worked and will be compensated."   (Doc. No. 157-2 at 15.)   Likewise, Charter's Code of Conduct prohibited managers and supervisors "from directing or encouraging nonexempt employees to misstate hours worked on their timesheets"; cautioned employees that they "may not, under any circumstances, work 'off the clock,'" defined as "work that is performed but that is not reported on your timesheet"; and advised employees that "[n]o one is authorized to instruct [them] to work off the clock."   (Doc. No. 157-1 at 38.) Finally, Charter at all relevant times required its agents to certify on their timesheets:   "I

have accurately and completely reported on this timesheet all hours that I worked during this pay period . . . ."   (Doc. No. 157-1 at 45.)

Charter also provided agents specific written policies and procedures as to the sequence in which agents should clock in and out, and load and close tools:

> Agents should be at their desk no earlier than the time their shift begins.   At this time, the agent should log into the computer.   Once logged into Windows, log into the Avaya soft phone first (which will also log into hard phone).   As the agent logs into other required programs, the agent may go into Auxiliary (AUX) status in the soft phone to avoid taking calls until those programs are available.   If the agent is at his or her desk and unable to log into the Avaya soft phone, the agent should log into the hard phone (to indicate they are at their position) and contact the supervisor so an exception can be entered . . . .

(Doc. No. 144-14 at 2.)   These instructions were first distributed to agents in October 2008, and an amended but substantially identical version was distributed in January 2010.

Although Charter's policies prohibited off-the-clock work throughout the class period, the manner in which agents were compensated changed in the middle of the class period, on July 1, 2010.   Before July 1, 2010, call center agents were paid in 15-minute increments.   Under this system, Charter rounded seven minutes down, eight minutes up.   Thus, if an agent clocked in at 8:07 a.m., he would be retroactively paid to 8:00 a.m.   But if he clocked in at 8:08 a.m., he would be paid beginning at 8:15 a.m.[4]

On July 1, 2010, Charter launched an automated time and attendance system, known as eTime, which compensated agents to the minute of actual time logged by the

---

[4]      Plaintiffs do not allege in this lawsuit that the pre-July 2010 rounding practice itself violated the FLSA.   Rather, as described below, Plaintiffs allege that, notwithstanding Charter's facially compliant written pay policies throughout the class period, certain *de facto* policies and practices required or pressured agents to work off the clock.

employee, plus an additional three minutes of pay to compensate agents for the time it took to start their computers and clock in to the soft phone, and to shut down their computers after they clocked out of the soft phone.   The extra three minutes of pay was provided even if agents clocked in and out using the hard phone (which did not require them to first start their computers).   Under Charter's written policies, if it took agents more than three minutes to start and shut down their computers, agents were to report this fact to a supervisor so that additional pay could be provided.

Plaintiffs allege that, besides merely starting and shutting down their computers, they loaded and closed additional tools off the clock, and that these additional activities, in combination with starting and shutting down their computers, took more than three minutes on average, and resulted in unpaid overtime compensation.   Specifically, Plaintiffs allege that, notwithstanding Charter's written policies to compensate call center agents for all hours worked, including time spent loading and closing tools, Charter employed a uniform *de facto* policy to require or pressure agents to load and close tools before and after their paid shifts.   Plaintiffs allege that these activities were integral and indispensable to performance of the agents' primary work duties, and that agents were not properly compensated for these activities by Charter.

Initially, Plaintiffs alleged that Charter's *de facto* policy was implemented by two practices:   (1) supervisors and training managers instructed call center agents to load and close tools off the clock so that agents would be fully prepared to respond to calls from beginning to end of paid shifts, and (2) Charter reduced agents' "schedule compliance"

score if agents loaded and closed tools while clocked in; the schedule compliance score was a performance metric which required agents to maintain a high percentage (such as 97%) of adherence to assigned shift times.   In connection with their motion for conditional FLSA collective action certification, Plaintiffs submitted 11 nearly identical declarations from present and former call center agents, stating that they and other agents experienced the practices described above, and that these practices required them to load and close tools off the clock, resulting in unpaid overtime.

At the conditional certification stage, the Court found that these allegations were sufficient to satisfy the "modest factual showing" required at that stage, that the named Plaintiffs "and potential plaintiffs together were victims of a common policy or plan that violated the law."   (Doc. No. 172 at 7.)

Now, at the decertification stage, Plaintiffs state that they are no longer relying on Charter's schedule compliance score practices to prove Charter's *de facto* policy.   Instead, Plaintiffs contend that they will prove Charter's *de facto* policy solely based on class-wide evidence that Charter supervisors and trainers instructed the Opt-In Plaintiffs to load and close tools off the clock, and that the Opt-In Plaintiffs uniformly followed that instruction.

As common evidence of Charter's class-wide instruction and training to load and close tools off the clock, and of the Opt-In Plaintiffs' adherence to that training and instruction, Plaintiffs offer additional declarations.   In total, 520 Opt-In Plaintiffs (some from each call center) have now filed nearly identical declarations stating that, before September 2011, Charter instructed them to load tools before they clocked in, and to close

those tools after they clocked out; and that by complying with such instructions, the declarants performed overtime work for which they were not properly compensated. Approximately 38 of these Opt-In Plaintiffs have been deposed by Charter.

The other evidence Plaintiffs offer is a study by their proffered expert, statistician L. Scott Baggett, Ph.D., which Plaintiffs assert demonstrates that almost all of the Opt-In Plaintiffs performed uncompensated work during the relevant time period.[5]   In his study, Dr. Baggett compared Charter's "active administrator" ("AA") data, which tracks time and date information of computer activity, to clock-in and clock-out records for each Opt-In Plaintiff for whom such data was produced by Charter (approximately half of the Opt-In Plaintiffs).   As Dr. Baggett explained in his report, he "identified the amounts of time between the first event of each day reflected in the [AA] data and the daily clock-in (the 'pre-shift time')," as well as "the amounts of time between the last event of each day reflected in the [AA] data and the daily clock-out (the 'post-shift time')."   (Doc. No. 423-53 at 4.)   Dr. Baggett adjusted his data to remove "anomalous" events, such as "dates in the [AA] data that included more than 16 hours of logon times within a single calendar day," which could indicate that a computer was left logged on overnight or for another period during which the agent was not actually present at work.   *Id.*   His report states that "[o]nly [AA] logon events within 45 minutes" before a recorded clock-in time and after a recorded clock-out time were considered as "eligible" pre-shift and post-shift time.   Dr.

---

[5]      Charter informed the Court of its intent to file a motion challenging Dr. Baggett's report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but pursuant to the joint request of the parties, such motions would not be due until 90 days after the Court rules on this motion for decertification.   (Doc. No. 421.)

Baggett considered "over 10,000 workdays or shifts across all employees for which AA data was disclosed by Charter."   He states that his analysis shows "unpaid pre-shift activity on 70% of the workdays for which AA data are available and . . . unpaid post-shift activity on 60%" of such workdays.   (Doc. No. 423-57 at 7-8.)   Dr. Baggett concludes that "[t]he average pre-shift time across all employees for which AA data are available is 5 minutes and 56 seconds and the average post-shift time across all employees for which AA data are available is 1 minute and 47 seconds."   *Id.* at 8.   Dr. Baggett applied this average to pay periods for Opt-In Plaintiffs with missing AA data.   Then, assuming that the Opt-In Plaintiffs were performing compensable work during the pre-shift and post-shift times, and comparing Charter's payroll records, Dr. Baggett calculated the total amount of overtime pay owed all Opt-In Plaintiffs to be $110,013.96.[6]

## ARGUMENTS OF THE PARTIES

Charter argues that decertification is required because the Opt-In Plaintiffs are not similarly situated.   Specifically, Charter argues that any single Opt-In Plaintiff's evidence as to his supervisor's or trainer's instructions, and his response to those instructions, is not representative of the class as a whole.   Charter maintains that a collective action would deprive Charter of its ability to test each Plaintiff's evidence and to litigate individual defenses.

---

[6]     The figures described here are taken from Dr. Baggett's rebuttal report, dated September 15, 2016, in which he revised the damages calculations submitted in earlier reports.   Charter challenges this revision, but for purposes of this motion, primarily argues that the revised report, in any event, does not provide a mechanism to prove liability and damages through common evidence for the reasons discussed below.

As an initial matter, Charter argues that the difference in compensation systems before and after July 1, 2010, precludes a finding that the Opt-In Plaintiffs are similarly situated.   Charter argues that because the compensation system before July 1, 2010 rounded seven minutes down, and because even under Dr. Baggett's analysis, the Opt-In Plaintiffs on average took less than seven minutes to load and close tools off the clock, those Opt-In Plaintiffs who worked before July 1, 2010 would have been fully compensated (assuming that they arrived at work on time).   Therefore, Charter argues that those Opt-In Plaintiffs, particularly to the extent they worked exclusively before July 1, 2010, are not similarly situated to the Opt-In Plaintiffs who worked after July 1, 2010.

In addition to the change in compensation system, Charter offers evidence, in the form of declarations of trainers, supervisors, and managers, that each of the eight call centers was separately managed, and managers at each provided different training with respect to clock-in and clock-out procedures, such that there could be no uniformity among class members.   These trainers, supervisors, and managers generally all attest that they enforced Charter's policy prohibiting off-the-clock work strictly, and that they never trained or instructed agents to load and close tools off the clock.   However, the specific training and instruction they did provide differed across call centers.   For example, a manager at the Washington call center attested that agents there were trained to clock in using the soft phone before loading tools, but if agents arrived late, they were instructed to clock in using the faster hard-phone method first.   Whereas managers in Wisconsin

attested that agents there were allowed to start their computers and clock in five minutes before the start of shift to ensure that they could load tools on paid time.

Charter also offers evidence, in the form of deposition testimony of Opt-In Plaintiffs, that even within a single call center, training with respect to clock-in and clock-out procedures differed depending on the particular supervisor on duty.   Charter argues that the Opt-In Plaintiffs' declarations, which suggest they received uniform and express supervisor instructions to load and close tools off the clock, are not credible in light of their contradictory deposition testimony.

For example, Charter identifies several Opt-In Plaintiffs who admitted in their depositions that, contrary to their declarations, they could not recall any supervisor specifically instructing them to load and close tools activities off the clock.   These Opt-In Plaintiffs generally testified that, although their supervisors did not expressly instruct them to load and close tools off the clock, their supervisors did state or imply that they should be prepared to take calls at the start of their shifts, which they understood to mean that they should have their tools loaded before clocking in.   Other Opt-In Plaintiffs testified in their depositions that some but not all of their supervisors told them to load tools prior to clocking in and to close tools after clocking out.   One Opt-In Plaintiff who worked at the South Carolina call center testified that not only his supervisors, but also the director of his call center, instructed him to load and close tools off the clock.   Another Opt-In Plaintiff from the Washington call center testified that he received emails from managers saying "Don't log in early," but that his supervisor verbally told him that those emails were only

- 11 -

sent "as a matter of, like formality, direction that was given by management or upper leadership," and that the agent should nevertheless "continue to log in early so [the agent could] have better numbers" in terms of his performance metrics.   (Doc. No. 423-49 at 6.) Still other Opt-In Plaintiffs testified that at least some of their supervisors expressly instructed them *not* to load their tools until they clocked in, but other supervisors either stated or implied the opposite.

Charter argues that the Opt-In Plaintiffs' deposition testimony was equally varied with respect to when and how often they alleged to have loaded and closed tools off the clock.   For example, one Opt-In Plaintiff, Jean Julien, from the Massachusetts call center testified in her deposition that at least from January 6, 2010 until the end of her employment, she was instructed to and did load and close tools while clocked in to the soft phone and was thus fully paid for that time.   (Doc. No. 413-24 at 3-4.)   Likewise, some Opt-In Plaintiffs admitted in depositions that they were paid for all time worked for at least part of the class period because, for example, they clocked in using the hard phone or they clocked in using the soft phone but waited to load their tools until after clocking in, in accordance with Charter's written policies.   Charter argues that these variations in the Opt-In Plaintiffs' deposition testimony, which belie the uniformity of the same Opt-In Plaintiffs' declarations, make clear that one Opt-In Plaintiff's testimony at trial would not be representative of the class.

Next, Charter argues that its individualized defenses render collective treatment inappropriate.   Specifically, Charter argues that individualized assessment is required to

- 12 -

determine whether Charter knew or should have known that uncompensated work was being performed, as required to state an overtime claim; whether any of the alleged off-the-clock work was *de minimis* and therefore not the proper subject of an FLSA overtime claim; whether some Opt-In Plaintiffs should be judicially estopped from participating in this lawsuit because they filed for bankruptcy and failed to disclose their alleged FLSA claims in their bankruptcy pleadings; whether Charter is entitled to an offset against any damages owed to particular Opt-In Plaintiffs for a particular week, based on overpayment to those Opt-In Plaintiffs in other weeks; and whether each Opt-In Plaintiff is in fact a proper class member.

With respect to the last defense, Charter argues that named Plaintiff Penny Davenport is not a class member because she never filed a consent form to join the collective action.   Charter contends that it is too late for Davenport to opt in to the collective because the statute of limitations on her FLSA claim has expired.[7]   Therefore, Charter argues that in addition to granting its motion for decertification, the Court should dismiss named Plaintiff Davenport's FLSA claim.[8]

In response to Charter's motion, Plaintiffs rely heavily on the 2016 United States Supreme Court case, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ("*Tyson*

---

[7]     Charter argues that, even taking into account the maximum three-year limitations period for willful FLSA violations, and the periods of equitable tolling that the Court previously granted, Davenport (whose employment ended on December 21, 2011) would have had to file her consent by December 27, 2016, to avoid the time bar.

[8]     The three other named Plaintiffs each filed consent forms to join the FLSA collective action before the expiration of the statute of limitations.

*Foods*"), to assert that collective action certification is appropriate here because liability and damages may be proven by common evidence in the form of Dr. Baggett's study, in combination with the declarations and deposition testimony of the Opt-In Plaintiffs. Plaintiffs argue that Charter's facially FLSA-compliant written policies prohibiting off-the-clock work are unavailing in light of Plaintiffs' proof that the Opt-In Plaintiffs were uniformly trained and instructed to work off the clock.

Plaintiffs argue that the "most important evidence in this case" is Dr. Baggett's study and the underlying data that he examined.   Plaintiffs contend that, as in *Tyson Foods*, each Opt-In Plaintiff could and would use Dr. Baggett's study and the underlying computer data in his or her individual case to prove liability and damages, and accordingly, the same evidence could prove the Opt-In Plaintiffs' claims collectively.   Likewise, Plaintiffs argue that Charter's challenges to Dr. Baggett's study would apply class-wide.

Plaintiffs also argue that Charter's actual or constructive knowledge of the unpaid pre- and post-shift work may be proven by the testimony of some Opt-In Plaintiffs who testified that they complained to their supervisors about loading and closing tools off the clock.   Plaintiffs note that at least two of the Opt-In Plaintiffs received adjustments to their pay to compensate for any unpaid work, after they complained of such work.   Plaintiffs contend that this evidence of complaints to supervisors, followed by inaction or failure to remedy, could also prove Charter's willfulness on a collective basis.[9]

---

[9]     Plaintiffs seek to establish Charter's willfulness in order to extend the FLSA the statute of limitations from two years to three years.   *See* 29 U.S.C. § 255(a).

Next, Plaintiffs argue that Charter's defenses are not so individualized as to render collective adjudication inappropriate.   For example, Plaintiffs argue that Charter's *de minimis* defense applies to the aggregate amounts of work, and may be considered on a class-wide basis.   Likewise, Plaintiffs argue that Charter's judicial estoppel defense would fail on a classwide basis because neither estoppel nor waiver applies to FLSA claims.

Plaintiffs further argue that fairness and procedural considerations justify collective treatment of the Opt-In Plaintiffs' claims because it would be inefficient to try hundreds of individual complaints and it would deprive the Opt-In Plaintiffs, many of whose damages are less than the cost of the filing fee, of the benefit of pooled resources to resolve the common questions.

Finally, as to Charter's argument that Davenport is not a proper class member because she failed to file a consent form, Plaintiffs argue that Davenport's written consent to join the collective action was provided by virtue of her February 7, 2012 declaration in support of conditional certification (Doc. No. 11-3), in which she stated, "I am a plaintiff in Davenport v. Charter Communications, LLC, Case No. 4:12-cv-00007 (AGF)," and in which she described the basis for her overtime claim.

In reply, Charter reiterates the testimony of its trainers, supervisors, and managers, as well the Opt-In Plaintiffs themselves, which Charter asserts contradicts the Opt-In Plaintiffs' declarations that they were uniformly trained or instructed to work off the clock.

Charter also disputes Plaintiffs' assertion that Dr. Baggett's study constitutes common evidence to prove liability and damages.   Charter contends that Dr. Baggett's

study cannot prove liability or damages because, putting aside other its other deficiencies,[10]

the study improperly assumes that AA data is a proxy for compensable work.   Charter

argues that Dr. Baggett's study does not establish that agents performed compensable work

during the pre-shift and post-shift time (as opposed to, for example, surfing the internet).

Charter argues that the underlying premise—whether an Opt-In Plaintiff performed

compensable work during the alleged pre-shift and post-shift time established by Dr.

Baggett's study—can only be proven by individual testimony and cross-examination.

Charter distinguishes the *Tyson Foods* case, in which the expert actually observed donning

and doffing activities involved in that case to arrive at the average time spent on such

activities.

## DISCUSSION

Section 216(b) of the FLSA allows named plaintiffs to sue "for and in behalf of . . .

themselves and other employees similarly situated."   29 U.S.C. § 216(b).   The statute

provides a procedure for plaintiffs to join suit by filing a written consent to become a party,

but the statute does not prescribe any standard or procedure for the court to determine

whether these plaintiffs are similarly situated.   Nevertheless, district courts generally have

applied a two-step approach by which named plaintiffs first seek conditional certification

---

[10]      Charter argues that Dr. Baggett's study is flawed in a myriad of ways, which it may
raise in more detail in a *Daubert* motion.   As one example, Charter argues that Dr. Baggett
ignored "thousands of instances in which AA data for the opt-in Plaintiffs showed that it
started at or *after* the timeclock data for pre-shift activity and ended at or *before* the
timeclock data for post-shift activity"—in other words, instances showing no off-the-clock
computer activity.   (Doc. No. 431 at 25 n.10.)   Charter suggested at oral argument that
these instances likely reflect the Opt-In Plaintiffs' use of the hard phone to clock in before
even starting their computers.

to facilitate notice to the proposed class; then, typically after the close of the opt-in period and discovery, the defendant may move to decertify the collective action if the record reveals that the opt-in plaintiffs are not similarly situated.   *See, e.g.*, *Fry v. Accent Mktg. Serv., L.L.C.*, No. 4:13 CV 59 CDP, 2013 WL 4093203, at *2 (E.D. Mo. Aug. 13, 2013).

The initial motion for conditional certification is typically, and was here, filed before significant discovery has taken place, and the plaintiffs' burden at this stage is lenient, requiring "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan."   *Davis v. NovaStar Mortg., Inc.*, 408 F. Supp. 2d 811, 815 (W.D. Mo. 2005).   At the second stage, however, courts apply a stricter standard, including making a "factual determination" as to whether the opt-in plaintiffs are similarly, but not necessarily identically, situated.   *Beasly v. GC Services LP*, 270 F.R.D. 442, 444 (E.D. Mo. 2010).

"Plaintiffs may be similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs."   *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014)*, aff'd*, 136 S. Ct. 1036 (2016).   A court may consider "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."   *Id.*   Although this test appears to be less stringent than the standard to certify a class under Rule 23, given the analytical overlap, "it is not mere coincidence that courts facing parallel motions to decertify an FLSA collective action under Section 216(b)

and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis."  *Ruiz v. Citibank, N.A*., 93 F. Supp. 3d 279, 298-99 (S.D.N.Y. 2015).

After more than two years of discovery, the Court concludes that Plaintiffs have failed to demonstrate that they suffered from a single, FLSA-violating policy that operated to common effect.   The only uniform policy established in this case is Charter's facially compliant written policies to pay agents for all time worked, including for time spent loading and closing tools.

Plaintiffs' lack of evidence of a common policy distinguishes this case from *Tyson Foods*.   In *Tyson Foods*, the employer's express policy was to pay its employees only a limited amount of minutes (called "K-code" time), or in some cases nothing, for compensable time spent donning and doffing their gear.   The employer also did not record the time each employee spent donning and doffing.   *Tyson Foods*, 136 S. Ct. at 1042. The Supreme Court found that because the employer did not keep records of donning and doffing time, each employee in his individual case—and the employees collectively—could rely on an expert study to prove such time.   *Id.* at 1047 ("If the employees had proceeded with 3,344 individual lawsuits, each employee likely would have had to introduce [the expert's] study to prove the hours he or she worked.   Rather than absolving the employees from proving individual injury, the representative evidence here was a permissible means of making that very showing.").   The Court declined to announce a categorical rule as to whether and when such representative or statistical

samples could be used to establish or defend against liability in FLSA cases, but held that the permissibility of such samples turned "on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action."  *Id.* at 1046.

The expert in *Tyson Foods* conducted 744 videotaped observations of donning and doffing to arrive at an average amount of time that each employee in a particular department took for such activities.  *Id.* at 1043.  The expert then subtracted any K-code time provided to employees to calculate the amount of uncompensated work.  *Id.* at 1043-44.  The Supreme Court held that the plaintiffs' reliance on the expert's study to establish overtime liability "did not deprive [the employer] of its ability to litigate individual defenses."  *Id.* at 1047.  The Court reasoned that "[s]ince there were no alternative means for the employees to establish their hours worked, [the employer's] primary defense was to show that [the expert's] study was unrepresentative or inaccurate," and such a defense was "itself common to the claims made by all class members."  *Id.*

In so holding, the Supreme Court distinguished its prior case, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("*Wal-Mart*").  *Wal-Mart* involved a nationwide class of current and former female employees who alleged sex discrimination based on local managers' discriminatory practices.  *Wal-Mart*, 564 U.S. at 344.  The employees did not allege that Wal-Mart had any express policy to discriminate against women, but they claimed that their local managers' practices were indicative of a "corporate culture" permitting discrimination.  *Id.* at 344.  The Supreme Court reversed class certification

upon finding that the employees failed to satisfy Rule 23's requirement that the class members share a common question of fact or law.   *Id.* at 355-56.

The Court in *Tyson Foods* distinguished *Wal-Mart* by noting that "[t]he plaintiffs in *Wal–Mart* did not provide significant proof of a common policy of discrimination to which each employee was subject."   *Tyson Foods*, 136 S. Ct. at 1048.   Rather, "[t]he only corporate policy that the plaintiffs' evidence convincingly established was Wal-Mart's policy of allowing discretion by local supervisors over employment matters; and even then, the plaintiffs could not identify a common mode of exercising discretion that pervaded the entire company."   *Id.* (citing *Wal-Mart*, 564 U.S. at 355-56).   Unlike in *Tyson Foods*, "[t]he plaintiffs in *Wal-Mart* proposed to use representative evidence as a means of overcoming this absence of a common policy," which was impermissible.   *Id.*

The *Tyson Foods* Court put it this way:

> Since the Court [in *Wal-Mart*] held that the employees were not similarly situated, none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers. By extension, if the employees had brought 1½ million individual suits, there would be little or no role for representative evidence. Permitting the use of that sample in a class action, therefore, would have violated the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action.

*Id.*

Here, the Court has significant concerns regarding the reliability of Dr. Baggett's study, and whether it properly reflects unpaid compensable work.   But perhaps more problematic is that Plaintiffs propose to use Dr. Baggett's study, as well as anecdotal

- 20 -

evidence, as a means to overcome the absence of a common policy.   That makes this case

more like *Wal-Mart* than *Tyson Foods*.   As in *Wal-Mart*, none of the Opt-In Plaintiffs

could prevail in an individual suit by relying on the testimony of other Opt-In Plaintiffs

detailing the ways in which their particular supervisors or trainers instructed or pressured

them to load and close tools off the clock.   Rather, each Opt-In Plaintiff may succeed in

his or her individual claim by testifying regarding his or her own training and supervision,

and the manner in which he or she clocked in and loaded and closed tools over various

periods of time.   There is little role for representative evidence.  *See Wal-Mart*, 564 U.S.

at 355-56; *see also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 375 (7th Cir. 2015)

("Cases in which low-level managers use their given discretion to make individual

decisions without guidance from an overarching company policy do not satisfy

commonality because the evidence varies from plaintiff to plaintiff."); *Steger v. Life Time*

*Fitness, Inc*., No. 14-CV-6056, 2016 WL 245899, at *3 (N.D. Ill. Jan. 21, 2016) (denying

conditional certification because "the evidence shows that the proposed class was

impacted, not by a uniform if unwritten corporate policy, but rather by the individual

actions of specific department heads acting contrary to corporate policy, as moderated by

each employee's individual decisions"); *Ruiz*, 93 F. Supp. 3d at 295 (decertifying

collective action, notwithstanding "the evidence amassed by Plaintiffs of individual

violations, of systematic violations at the branch level, and even of violations induced by

certain area directors across multiple branches," because the "record in its totality

show[ed] that [the employer's] formal, companywide policies are entirely legal and

appropriate, and that there [was] no evidence of a common plan or scheme to subvert these policies").   Therefore, the Court will grant Charter's motion to decertify the collective action.

**Davenport's Written Consent**

The FLSA provides the following consent requirement:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.   No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).   The filing of a written consent also "commences" an FLSA collective action for purposes of the two-year (or three-year if the claim arises out of a "willful" violation) statute of limitations.   29 U.S.C. § 256.

Because the complaint here states that Plaintiffs bring Count I "as a collective action under the FLSA on behalf of themselves and all other similarly situated Call Center Employees employed by Charter at its call centers within the last three (3) years" (Doc. No. 69 at 3), all Plaintiffs, including named Plaintiffs like Davenport, were required to file written consent to commence their FLSA claim before the statute of limitations expired. *See Acosta v. Tyson Foods, Inc.*, 800 F.3d 468, 472 (8th Cir. 2015) (finding that because the complaint alleged an FLSA collective action, the named plaintiff "Acosta was required to file a written consent to proceed as a party plaintiff," and "[b]ecause he failed to do so before the statute of limitations expired, the district court should have dismissed Acosta's claim under the FLSA"); *Gomez v. Tyson Foods, Inc.*, 799 F.3d 1192, 1194 (8th Cir. 2015)

(same).   The statute of limitations is tolled "between the time each individual opt-in plaintiff consents to the suit and the time each opt-in plaintiff must pursue their claim individually because of dismissal from the collective action or a court's decision to decertify the class."  *Ford v. Navika Capital Grp., LLC*, No. CV 14-00311-KD-C, 2016 WL 1069676, at \*12 (S.D. Ala. Mar. 17, 2016) (collecting cases applying class action tolling to FLSA collective actions).

The FLSA, however, does not specify the form of written consent.   Charter correctly notes that, in a recent case in this District, the court found that a named plaintiff's motion for conditional certification, declaration, and interrogatories did not satisfy the written consent requirement because the plaintiff did not "cite to any part of either her interrogatories or her declaration where she expresse[d] her consent to become a party plaintiff."  *Liebesman v. Competitor Grp*., No. 4:14-CV-1653 RLW, 2016 WL 204461, at \*3 (E.D. Mo. Jan. 15, 2016).

But here, Davenport's February 7, 2012 signed declaration, filed in support of Plaintiffs' initial motion for conditional certification, clearly declares that she is a party plaintiff in this case, and further describes the basis for her overtime claim.   The Court finds, as other district courts around the country have found, that this declaration sufficiently indicates Davenport's consent to proceed as a party plaintiff in the FLSA collective action.  *See, e.g., Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 800 (D. Md. 2014) (finding a declaration in support of conditional certification sufficient to constitute written consent, in line with other courts that have required "only that "the

signed document verify the complaint, indicate a desire to have legal action taken to protect the party's rights, or state a desire to become a party plaintiff") (citing cases); *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 281-82 (E.D.N.Y. 2013) (holding that "courts have generally not taken a strict approach with regard to the *form* of the written consent, at least with respect to named plaintiffs," and that a filed declaration in which "the Plaintiff clearly identifies himself as the named Plaintiff in this action" was sufficient written consent) (citations omitted); *see also Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 736 n. 11 (noting that, if the written consent requirement applied to a nonclass action, "it was satisfied when petitioners individually signed at least two sets of interrogatories").   Because Davenport's declaration was filed before the statute of limitations expired, her FLSA claim was timely commenced and the statute of limitations has been tolled ever since.   The Court will not dismiss Davenport's FLSA claim.   *See Alvarez v. City of Chicago*, 605 F.3d 445, 450 (7th Cir. 2010) ("When a collective action is decertified, it reverts to one or more individual actions on behalf of the named plaintiffs.").

**CONCLUSION**

For the foregoing reasons, the Court will grant Charter's motion to decertify the FLSA collective action.   The named Plaintiffs' claims will remain pending before this Court, but the Court will dismiss the Opt-In Plaintiffs' claims without prejudice.   With the consent of the parties, and to avoid prejudice to those Opt-In Plaintiffs who wish to file individual lawsuits, the Court will also invoke its equitable powers to toll the applicable statute of limitations for 60 days after entry of this Memorandum and Order.   *See Proctor*

*v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008) (applying similar equitable tolling).

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to decertify the conditionally certified FLSA class is **GRANTED**.   (Doc. No. 410.)

**IT IS FURTHER ORDERED** that the claims of the Plaintiffs who have opted in to the collective action are **DISMISSED without prejudice**, such that only the claims of named Plaintiffs Penny Davenport, Rita Gentry, Angela Nelson, and Joshua Westmaas remain pending before the Court.

**IT IS FURTHER ORDERED** that the applicable statute of limitations for the FLSA claims of the Plaintiffs who have opted in to the collective action is tolled for a period of **60 days** from the date of this Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' counsel shall promptly notify the Plaintiffs who have opted in to the collective action of this Memorandum and Order, and shall file a notice with the Court confirming that they have done so.

**IT IS FURTHER ORDERED** that within **14 days** of the date of this Memorandum and Order, the remaining parties shall file a joint proposed amended schedule for the remainder of the litigation, including a proposed trial date.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 6th day of March, 2017.

- 25 -